INTERNATIONAL SERVICE INSURANCE COMPANY v. IOWA NATIONAL MUTUAL INSURANCE COMPANY

No. 33

(Filed 30 January 1970)

1. **Automobiles § 5— transfer of automobile title — pre-1961 law**

Prior to 1961, a purchaser of a motor vehicle acquired title notwithstanding the vendor's failure to deliver a certificate of title or the purchaser's failure to make application for a new certificate to the Department of Motor Vehicles.

2. **Statutes § 7— construction of amendments — presumptions — legislative intent**

In construing a statute with reference to an amendment it is presumed that the legislature intended either to change the substance of the original act or to clarify the meaning of it.

3. **Statutes § 7; Automobiles § 5— transfer of automobile title — statutory amendments — presumption**

Where decisions of the Supreme Court had made it perfectly clear that the purchaser of a motor vehicle prior to 1 July 1961 acquired title notwithstanding vendor's failure to deliver a certificate of title or vendee's failure to make application to the Department of Motor Vehicles for a new certificate, it is logical to conclude that the 1961 amendments to G.S. 20-72(b) and G.S. 20-75, which added to each section the proviso that transfer of ownership in a vehicle by an owner or dealer is not

effective until provisions of the statutes have been complied with, were intended to and did change the law with respect to transfer of ownership of motor vehicles.

**4. Automobiles § 5— transfer of automobile title — prerequisites — post-1961 law**

After 1 July 1961, the effective date of amendments to G.S. 20-72(b) and G.S. 20-75, no title passes to the purchaser of a motor vehicle until the certificate of title has been assigned by the vendor and delivered to the vendee or his agent, and application has been made for a new certificate of title.

**5. Automobiles § 5— transfer of automobile title — compliance with G.S. Ch. 20 — accident — ownership of car**

Where the vendor of an automobile involved in an accident on 27 May 1963 had transferred possession of the automobile to the vendee prior to the date of the accident, but vendor did not transfer title to vendee or execute and acknowledge an application for a new certificate of title until the day after the accident, the ownership of the automobile remained in the vendor on the date of the accident. G.S. 20-72(b), G.S. 20-75.

**6. Appeal and Error § 67— decision of Supreme Court — interpretation**

A decision of the Supreme Court must be interpreted within the framework of the facts of that particular case.

**7. Insurance § 87— use of automobile — express permission**

Where express permission to use an automobile is relied upon, it must be of an affirmative character, directly and distinctly stated, clear and outspoken, and not merely implied or left to inference.

**8. Insurance § 87— use of automobile — implied permission**

Implied permission to use an automobile involves an inference arising from a course of conduct or relationship between the parties in which there is mutual acquiescence or lack of objection under circumstances signifying assent.

**9. Insurance § 88— automobile dealer's liability insurance — coverage — use of automobile — permission of vendor — sufficiency of evidence**

Evidence *held* insufficient to support a finding that prospective purchaser of automobile had the vendor's permission, express or implied, to operate the automobile at the time purchaser's brother wrecked the automobile in an accident, and consequently the purchaser was without authority to extend driving privileges to his brother and thereby bind the vendor's liability carrier, where the evidence was to the effect that the automobile, with dealer tags removed, had been delivered to the purchaser's home with the understanding that the purchaser would obtain liability insurance over the weekend and return to the vendor with an FS-1 form in order to obtain the title certificate and license tags.

MOORE, J., took no part in the consideration or decision of this case.

ON certiorari to the Court of Appeals to review its decision upholding the judgment of *Armstrong, J.,* at the 6 January 1969 Civil Session, FORSYTH Superior Court.

Action under Declaratory Judgment Act for declaration of rights arising under separate policies of liability insurance issued by plaintiff and defendant. The trial court heard the case on an agreed statement of facts as summarized below:

1. The plaintiff (International) is a corporation organized and existing under the laws of Texas and is authorized to do business and is doing business in North Carolina.

2. Prior to 27 May 1963 International issued to James Walter Zimmerman (James) its assigned risk liability policy number 791565-12 on a 1955 Ford automobile owned by James. This policy was in full force and effect on 27 May 1963.

3. The defendant (Iowa) is a corporation organized and existing under the laws of Iowa and is authorized to do business and is doing business in North Carolina.

4. Prior to 27 May 1963 Iowa issued to Piedmont Auto Finance Company of High Point, North Carolina, (Piedmont) its automobile liability policy number CGA19107879. This policy was in full force and effect on 27 May 1963.

5. On or prior to 24 May 1963 Piedmont took lawful possession from John Wesley Tuttle of a 1958 Ford automobile, serial number G8NT106432. The date of repossession shown on the Affidavit of Repossession was 27 May 1963. The date of notarization of said affidavit is recited on it as 28 May 1963.

6. On Saturday, 25 May 1963, John Wesley Zimmerman (John) negotiated with and agreed to purchase from Piedmont said 1958 Ford for $695, made a $100 down payment, received a bill of sale, and signed a note for the balance of the purchase price and interest charges.

7. On the same date, 25 May 1963, an official of Piedmont signed in blank the assignment of title on the back of the title certificate of said automobile, and John signed in blank the purchaser's application for new certificate of title on the back of the title of said automobile. The title certificate was not given to John on that date, but remained in the possession of Piedmont.

8. John did not have automobile liability insurance on 25 May 1963. It was understood by Piedmont that John would obtain liability insurance over the weekend and return to Piedmont on Tues-

day, 28 May 1963, with an FS-1 form at which time the title certificate was to be completed and turned over to John and he would then purchase license tags for said 1958 Ford automobile.

9. On Saturday, 25 May 1963, said 1958 Ford automobile was delivered to John's home and parked behind his house. The dealer tags were removed from the automobile and it was left on John's premises without tags on it.

10. Application by John for liability insurance under the North Carolina Assigned Risk Plan was dated 25 May 1963 and shows Statewide Insurance Agency of High Point as producer of record. Said application was mailed to the North Carolina Department of Insurance.

11. On 25 May 1963 John purchased through Piedmont collision insurance on said automobile with American Security Insurance Company.

12. James is the brother of John and both were over twenty-one years of age at all times pertinent to this action. They did not reside in the same household.

13. On 27 May 1963 James was driving said 1958 Ford automobile with the permission of John and was involved in an accident with a vehicle operated by James Floyd Pendry. John was not present in the 1958 Ford automobile at the time of the accident.

14. At the time of the accident said 1958 Ford automobile displayed a set of license tags which had been previously issued to James on a 1955 Ford, being 1963 North Carolina tags B-2827.

15. On Tuesday, 28 May 1963, John received by mail an FS-1 form dated 27 May 1963 and showing effective date of 28 May 1963, notifying him that his application for insurance had been approved and assigned to American Motorist Insurance Company. On 28 May 1963 the transfer of title and application for new title certificate on the back of the title to said 1958 Ford were completed and notarized. Shortly thereafter, John took the FS-1 form to Piedmont, picked up the completed title certificate and purchased license tags for said 1958 Ford. He did not notify Piedmont that the automobile had been involved in an accident on the previous day.

16. In August 1963 International was notified of possible claims arising out of the aforesaid accident. Pendry instituted a civil action against James Walter Zimmerman in November 1963 alleging damages in excess of $5,000. In December 1963 attorneys retained by International filed answer on behalf of James. International's inves-

tigation revealed that the date shown on the transfer of title was 28 May 1963, the day after the accident; and International took the position that at the time of the accident title to said automobile was in Piedmont. The first notice of the accident received by Iowa was 8 April 1964 when International notified Iowa of this finding and that International was taking the position that Iowa had primary coverage. On 5 May 1964 Iowa declined coverage and notified International accordingly. On 22 May 1964 International forwarded to Iowa copies of the complaint and answer in the Pendry action and again contended that primary coverage was with Iowa. On 23 October 1964 International sent notice to Iowa by certified mail that the case was scheduled for trial on 26 October 1964 and that there was a possibility of settlement; and that unless International's attorney heard from Iowa by 26 October 1964 the case would be settled if possible. Iowa continued to deny coverage and International continued to insist that its coverage was secondary. Nevertheless, International defended the action on behalf of James in order to protect its alleged secondary liability. On 26 October 1964 the case was settled by International for $3800. They paid said judgment on behalf of James and, in addition, paid court costs of $32.75 and counsel fees for defense of said action in the sum of $738.08.

17. The amount of the settlement in the Pendry action and the costs and counsel fees paid by International were fair and reasonable.

18. Employees of Piedmont had not met James prior to the accident, and James had no part in the dealings between John and Piedmont.

The trial judge made findings of fact consistent with the foregoing enumeration and reached the following conclusions of law:

1. Ownership of the 1958 Ford automobile involved in the accident passed from Piedmont to John prior to 27 May 1963.

2. Ownership having passed from Piedmont prior to the date of the accident, said automobile was not owned by Piedmont on the date of the accident and the Iowa policy does not afford coverage on said automobile.

3. Further, irrespective of ownership, the agreed facts and reasonable inferences to be drawn from them do not establish that James was operating the automobile at the time of the accident with the permission, express or implied, of Piedmont and for this additional reason no coverage is afforded by the Iowa policy.

Upon the foregoing findings of fact and conclusions of law, judgment was rendered in favor of defendant and plaintiff appealed to the Court of Appeals. That court affirmed by decision appearing in 5 N.C. App. 236, 168 S.E. 2d 66. We allowed certiorari.

. *Deal, Hutchins and Minor by William K. Davis and Edwin T. Pullen, Attorneys for plaintiff appellant.*

*Hudson, Petree, Stockton, Stockton & Robinson by J. Robert Elster, Attorneys for defendant appellee.*

HUSKINS, J.

The policy of liability insurance issued by Iowa to Piedmont Auto Finance Company affords coverage not only to Piedmont and its officers and agents but also to "any person while using an owned automobile . . . . provided the actual use of the automobile is by the named insured or with his permission. . . ."

Plaintiff contends (1) that the provisions of G.S. 20-72(b) relating to transfer of ownership were not complied with until 28 May 1963, one day after the accident, so that ownership of the 1958 Ford remained in Piedmont until that date; and (2) that Piedmont gave "broad and unfettered custody, dominion and control" of the vehicle to John Wesley Zimmerman on 25 May 1963 and thus impliedly permitted him to allow his brother James Zimmerman to use the vehicle thereby bringing James within the coverage of defendant's policy. Since the question of permission arises only if ownership remained in Piedmont at the time of the accident on 27 May 1963, we look first at the question of ownership.

[1] It is well settled, we think, that, prior to 1961, a purchaser of a motor vehicle acquired title notwithstanding the vendor's failure to deliver a certificate of title or the purchaser's failure to make application for a new certificate to the Department of Motor Vehicles. *Corporation v. Motor Co.,* 190 N.C. 157, 129 S.E. 414; *Finance Co. v. Pittman,* 253 N.C. 550, 117 S.E. 2d 423; *Godwin v. Casualty Co.,* 256 N.C. 730, 125 S.E. 2d 23; *Credit Co. v. Norwood,* 257 N.C. 87, 125 S.E. 2d 369; *Indemnity Co. v. Motor Co.,* 258 N.C. 647, 129 S.E. 2d 248; *Luther v. Insurance Co.,* 262 N.C. 716, 138 S.E. 2d 402; *Bank v. Motor Co.,* 264 N.C. 568, 142 S.E. 2d 166.

In *Corporation v. Motor Co., supra,* decided in 1925, it was held that a sale of personal property is not required to be evidenced by any written instrument in order to be valid, and that a statute requiring issuance of a "certificate of title" to the purchaser of an au-

tomobile, and making failure to do so a misdemeanor, was merely a police regulation to protect the general public from fraud, imposition and theft of motor vehicles. In *Peek v. Trust Co.*, 242 N.C. 1, 86 S.E. 2d 745, the lower court charged: "Now, the law does not prohibit the sale of a motor vehicle without transfer and delivery of certificate of registration of title; in other words, one can sell a motor vehicle on one day and the title pass, and deliver or transfer the paper certificate of title on a later date." In approving that instruction, this Court said: "[I]t is observed that the instruction as given is precisely in accord with the decision in *Corporation v. Motor Co.*, 190 N.C. 157, 129 S.E. 2d 414."

In *Bank v. Motor Co., supra* (264 N.C. 568, 142 S.E. 2d 166), Rodman, J., reviewed the history of this question and noted that "[n]otwithstanding the conclusion reached in 1925, litigants continued their efforts to secure a judicial declaration that certificates of title for motor vehicles issued under then existing statutes were analagous to statutory certificates of title for real estate, registered as to title, pursuant to the provisions of c. 43 of the General Statutes." We had last answered these contentions in *Finance Co. v. Pittman, supra* (253 N.C. 550, 117 S.E. 2d 423), decided in December 1960, when we said: "The interpretation given in 1925 has not been rejected by the Legislature. If public policy now requires a different system of establishing ownership and encumbrances on motor vehicles, such policy must be declared by the Legislature. It can enact laws to accomplish that purpose. We have neither the power nor the desire to usurp its prerogative."

[2, 3] Following the *Pittman* decision in 1960, the General Assembly (which convened in February 1961) amended G.S. 20-72(b) and G.S. 20-75, effective 1 July 1961, by adding at the end of each section the following sentence: "Transfer of ownership in a vehicle by an owner (by a dealer) is not effective until the provisions of this subsection have been complied with." See sections 8 and 9, Chapter 835, Session Laws 1961. The prompt enactment of these amendments following our decision in *Pittman* impels the conclusion that it was the legislative intent to change what was formerly the law. "In construing a statute with reference to an amendment it is presumed that the legislature intended either (a) to change the substance of the original act, or (b) to clarify the meaning of it." *Childers v. Parker's, Inc.*, 274 N.C. 256, 162 S.E. 2d 481. Here, there was no ambiguity to clarify. Decisions of this Court had made it perfectly clear that the purchaser of a motor vehicle prior to 1 July 1961 acquired title notwithstanding vendor's failure to deliver a certificate

of title or the vendee's failure to make application to the Department of Motor Vehicles for a new certificate. It is therefore logical to conclude that the 1961 amendments to G.S. 20-72(b) and G.S. 20-75 were intended to and did change the law with respect to transfer of ownership of motor vehicles. 1 Sutherland, Statutory Construction § 1930 (1968 Cum. Supp. to Horack's 3d ed., 1943).

The foundation for this decision was laid in 1925 in our decision in *Corporation v. Motor Co., supra,* when we said:

> "Plaintiff cites *Miller v. Ins. Co.,* 230 Pac., 1039, from Kansas; *Curry v. Iowa Truck & Tractor Co.,* 187 N.W., 36, from Iowa; *Crandall v. Shay,* 214 Pac., 450, from California. These cases hold with much clarity of reasoning and support in numerous precedents, that the sale and transfer of title are void when the statute prohibits such unless in compliance with its requirements. *Miller v. Ins. Co., supra,* deals with the Missouri statute which says: 'Any sale or transfer of such motor vehicle without complying with the provisions of this section shall be fraudulent and void.' The provisions referred to are similar to the requirements in the North Carolina statute in detail.

> "In *Curry v. Iowa Truck & Tractor Co., supra,* the Iowa statute provides: 'Until said transferee has received said certificate of registration, and has written his name upon the face thereof, delivery and title to said motor vehicle shall be deemed not to have been made and passed.'

> "In *Crandall v. Shay, supra,* the quoted section of the statute is the same as in the *Curry case, supra,* with this in addition: 'And said intended transfer shall be deemed to be incomplete and not to be valid or effective for any purpose.'

> "The pivotal provision of the statutes in these cases are absent from our statute. The North Carolina statute contents itself with penal provisions, operative on the persons who violate them, including the prohibition of the use of the vehicle on the highways, and no more. Our Legislature could have provided, as did Iowa, Missouri and California, but it is clear that it did not, and we cannot extend the act beyond its provisions, however laudable the purpose, or beneficent the desired result."

The Legislature took positive action on 15 June 1961 to include in our statutes this "pivotal provision" lacking in 1925 by amending G.S. 20-72(b) and G.S. 20-75, effective 1 July 1961 to provide: "Transfer of ownership in a vehicle by an owner (by a dealer) is not effective until the provisions of this subsection have been complied with."

[4]    We hold therefore that after 1 July 1961, the effective date of the amendments, no title passed to the purchaser of a motor vehicle until (1) the certificate of title has been assigned by the vendor, (2) delivered to the vendee or his agent, and (3) application made for a new certificate of title. This accords with prior decisions in *Bank v. Motor Co., supra,* and *Credit Co. v. Norwood, supra.*

Cases relied on by the Court of Appeals are not controlling. *Luther v. Insurance Co., supra* (262 N.C. 716, 138 S.E. 2d 402), involved the sale and purchase of an automobile in 1957 and its involvement in an automobile accident prior to the effective date of the 1961 amendments. The court necessarily applied the former law to the facts of that case. *Indemnity Co. v. Motors, Inc., supra* (258 N.C. 647, 129 S.E. 2d 248), is factually distinguishable. There, the facts affirmatively show that on 16 September 1961 the dealer (vendor) had, as required by the statute, delivered the duly assigned certificate of title together with the purchaser's application for a new certificate to the purchaser's agent, Smart Finance Company. It then became the legal duty of the vendee to make application for a new certificate of title within twenty days; and even though the certificate of title was delivered to a lien holder, it was nonetheless the duty of the purchaser to see that it was forwarded to the Department of Motor Vehicles within twenty days. G.S. 20-73; G.S. 20-74. This was not done. The purchaser failed to perform his statutory duty, and the certificate of title and application for a new certificate had not been presented to the Department of Motor Vehicles on 4 November 1961 when the purchaser, operating said vehicle, was involved in a collision. It was held that dealer should not be penalized because of the failure of the purchaser to perform his duty. The dealer had done all the law required of him.

[5, 6]    In the case before us, however, vendor had not executed and acknowledged an application for a new certificate of title. Vendor·had not parted with possession of the certificate of title and could still have used it to entrap the unwary or for any other purpose. "A decision of the Supreme Court must be interpreted within the framework of the facts of that particular case." *Howard v. Boyce,* 254 N.C. 255, 118 S.E. 2d 897; accord, *Carpenter v. Carpenter,* 244 N.C. 286, 93 S.E. 2d 617.

We now consider whether James Zimmerman was driving the 1958 Ford with the permission, express or implied, of its owner, Piedmont, at the time of the accident.

[7, 8]    "Where express permission is relied upon it must be of an

affirmative character, directly and distinctly stated, clear and out-spoken, and not merely implied or left to inference. On the other hand, implied permission involves an inference arising from a course of conduct or relationship between the parties, in which there is mutual acquiescence or lack of objection under circumstances signifying assent. *Hinton v. Indemnity Insurance Co. of North America,* 8 S.E. 2d 279 (Va. 1940)." *Hawley v. Insurance Co.,* 257 N.C. 381, 126 S.E. 2d 161; accord, *Hooper v. Casualty Co.,* 233 N.C. 154, 63 S.E. 2d 128.

It is disclosed by the agreed statement of facts that employees of Piedmont had not met James prior to the accident and James had no part in the dealings between John and Piedmont. This conclusively rebuts any suggestion of express permission. In fact, plaintiff makes no such contention. Rather, plaintiff contends John had express permission to do with the vehicle as he pleased because Piedmont had attempted to make a sale to John and maintains that ownership had been transferred to him. Therefore, plaintiff says, no limitations whatever were placed upon John's use of the automobile by Piedmont; rather, exclusive possession and control were given to John, including the implied permission for John to allow his brother James to drive.

[9] The fallacy of plaintiff's position lies in the assumption that John had Piedmont's permission to operate the vehicle upon the public highways. When the vehicle was delivered to John's home, Piedmont parked it and removed the dealer tags. It was understood that John would obtain liability insurance over the weekend and return to Piedmont on Tuesday with an FS-1 form at which time the title certificate would be delivered to John so he could purchase license tags. These facts negative the suggestion that John had Piedmont's permission to operate the vehicle, illegally or otherwise, until after he had obtained his insurance and purchased license tags. Piedmont's erroneous argument that ownership had been transferred to John does not alter these facts. The clear inference is that Piedmont neither intended nor anticipated that John — much less anyone else — would operate the vehicle until insurance and license tags had been obtained. Its illegal operation under the circumstances here disclosed cannot be characterized as a permissive use within the meaning of Piedmont's liability policy. Any other interpretation requires reaching and stretching which we are unwilling to do. For an exhaustive discussion of cases in which the courts have considered the extent of coverage afforded by the omnibus clause, see Annotation: Omnibus Clause of Automobile Liability Policy as Covering

Accidents Caused by Third Person who is Using Car with Consent of Permittee of Named Insured, 4 A.L.R. 3d 10.

Since John had no permission, express or implied, to operate the car at the time in question, we hold that he was without authority to extend driving privileges on illegal terms to his brother James and thereby bind the owner and the owner's liability carrier. "Failure to show coverage requires nonsuit." *Bailey v. Insurance Co.*, 265 N.C. 675, 144 S.E. 2d 898; *Kirk v. Insurance Co.*, 254 N.C. 651, 119 S.E. 2d 645; *Slaughter v. Insurance Co.*, 250 N.C. 265, 108 S.E. 2d 438.

It should be noted that, effective 1 July 1963, G.S. 20-72(b) and G.S. 20-75 were again materially changed by Chapter 552, Session Laws 1963.

The decision of the Court of Appeals is modified to conform with this opinion.

Modified and affirmed.

MOORE, J., took no part in the consideration or decision of this case.